J-S04018-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| MICHAEL EVANS, | |
| Appellant | No. 47 WDA 2015 |

Appeal from the PCRA Order of April 13, 2015
In the Court of Common Pleas of Allegheny County
Criminal Division at No(s): CP-02-CR-0010679-2009

BEFORE: BOWES, OLSON AND STRASSBURGER,* JJ.

MEMORANDUM BY OLSON, J.:                    **FILED FEBRUARY 22, 2016**

Appellant, Michael Evans, appeals from the order dated December 8, 2014 and entered April 13, 2015, which dismissed his second petition filed under the Post-Conviction Relief Act (PCRA), 42 Pa.C.S.A. §§ 9541-9546. We affirm.

The trial court previously summarized the underlying facts of this case:

> On June 20, 2009, James Williams saw two young black males enter 228 Perry Street, McKeesport, Pennsylvania, the home of the victim, Tami Heckman[; Ms. Heckman was] Williams' neighbor. Ryan Williams, the son of James Williams, heard the sound of gunshots, then saw two males, one of whom he could identify as black, running from the residence. Numerous witnesses heard shots fired in the vicinity of 228 Perry Street. One of the witnesses, Daniel McGhen, followed two males he observed running from the vicinity of 228 Perry [Street] to a bus shelter. One of the males was carrying something that the witness thought looked like a basket.

*Retired Senior Judge assigned to the Superior Court.

Officer Mark Marino received a report of two black males in dark clothing fleeing the scene, one of whom was carrying what dispatch described as a baby bag. The officer traveled toward a bus shelter, one of the few exit points from the area where the men were seen running. He observed a black male in dark clothing sweating profusely at the bus shelter. The officer got out of his car, saw another male just beyond the shelter and detained both individuals. Subsequently, the individuals were identified as Calvin Loving and Appellant.

Officer Steven Kondrosky, who arrived just after Officer Marino, assisted Officer Marino with the arrest and observed Appellant drop what the officer referred to as a laundry bag. Officer Kondrosky observed Appellant begin to walk away from the bag. After handcuffing Appellant, Officer Kondrosky went over to the bag and saw the barrel of a firearm clearly visible inside the bag. The officer observed that this weapon, a .357 caliber revolver, was fully loaded and had spent casings inside. The officer removed the firearm from the bag and observed a second weapon in the bag. Officer Kondrosky also noted that Appellant did not act like or smell like an intoxicated individual.

The .357 revolver recovered by Officer Kondrosky was tested by Thomas Morgan, an expert firearms examiner with the Allegheny County Medical Examiner's Office. Morgan testified that the gun was in good operating condition and that the cartridge casings and all of the bullets tested, including a bullet fragment recovered from the autopsy of the victim, all matched the bullets test fired from the .357 revolver recovered by Officer Kondrosky.[fn.1]

> [fn.1] Daniel Wolfe of the Allegheny County Medical Examiner's [O]ffice also testified that Appellant had gunshot residue on both hands consistent with discharging a firearm.

Dr. Todd Luckasevic performed the autopsy of [Tami] Heckman. [Dr. Luckasevic] testified that Ms. Heckman [had five gunshot wounds], with the most lethal shot entering [Ms. Heckman] from the back.

Calvin Loving testified that he went with Appellant to rob an individual who was known to sell drugs. That individual, the son of Tami Heckman, was not home. Loving testified that Appellant had two guns and gave one to Loving but Loving believed the gun he was given was not loaded. According to Loving, Appellant retained the .357 revolver. Loving testified that he and Appellant entered [Ms.] Heckman's residence and Appellant held the victim at gunpoint while Loving took various items within her residence. [Loving testified] that he observed Appellant strike [Ms. Heckman] on the head with his gun. [Loving testified that Ms. Heckman] attempted to flee[; according to Loving, he then] heard shots from the kitchen area, where only Appellant was located. Loving then [testified] that he and Appellant ran out of the front of the house after [Ms. Heckman] had been shot.

Detective Langan testified that he interviewed Appellant after [the] arrest. Detective Langan [testified that] Appellant admitted shooting the victim. Appellant elaborated to the detective, stating that he missed her with the first shot, hit her with the second shot[,] and the third shot "put her down."

Trial Court Opinion, 3/9/11, at 1 and 4-6 (internal citations omitted).

Prior to trial, Appellant filed a motion to suppress his post-arrest confession. Within the written suppression motion, Appellant claimed that, under the totality of the circumstances, his custodial confession was not voluntary, as it was the product of his "intoxicated state, the lack of *Miranda*[1] [w]arnings, the refusal to grant him his request for counsel, and

_____

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

- 3 -

the [five] hour delay between arrest and confession." Appellant's Motion to Suppress, 9/15/10, at 5-6.

With respect to Appellant's suppression motion, the following relevant evidence was presented to the trial court:[2, 3]

_____

[2] On October 30, 2013, our Supreme Court decided **In re L.J.**, 79 A.3d 1073, 1087 (Pa. 2013). In **L.J.**, our Supreme Court held that appellate scope of review from a suppression ruling is limited to the evidentiary record that was created at the suppression hearing. **In re L.J.**, 79 A.3d 1073, 1087 (Pa. 2013). Prior to **L.J.**, this Court routinely held that, when reviewing a suppression court's ruling, our scope of review included "the evidence presented both at the suppression hearing and at trial." **See Commonwealth v. Charleston**, 16 A.3d 505, 516 (Pa. Super. 2011), *quoting* **Commonwealth v. Chacko**, 459 A.2d 311, 317 n.5 (Pa. 1983). **L.J.** thus narrowed our scope of review of suppression court rulings to the evidence presented at the suppression hearing.

However, **L.J.** declared that the new procedural rule of law it announced was not retroactive, but was rather "prospective generally" – meaning that the rule of law was applicable "to the parties in the case and [to] all litigation commenced thereafter." **In re L.J.**, 79 A.3d at 1089 n.19. Since the litigation in the current case commenced before **L.J.** was filed, the new procedural rule of law announced in **L.J.** did not apply to the case at bar. **See id.** Thus, in summarizing the evidence that is relevant to Appellant's suppression motion, we include the evidence that was presented during both Appellant's September 27, 2010 suppression hearing and Appellant's jury trial.

[3] The trial court denied Appellant's motion to suppress. Trial Court Order, 9/27/10, at 1. Thus, in summarizing the evidence that is relevant to Appellant's suppression motion, we "consider only the evidence of the prosecution and so much of the evidence of the defense as remains uncontradicted when read in the context of the record." **Commonwealth v. Eichinger**, 915 A.2d 1122, 1134 (internal citations omitted).

- At 1:28 a.m. on June 20, 2009,[4] Officer Marino received a dispatch that shots were fired from a residence in the 200 block of Perry Street. N.T. Suppression Hearing, 9/27/10, at 17.

- At 1:33 a.m., City of McKeesport Police Officers Marino and Kondrosky arrested both Appellant and Mr. Loving. *Id.* at 28. The police then transported Appellant and Mr. Loving to the McKeesport Police Station. N.T. Jury Trial, 9/28/10, at 98-99.

- At 4:10 a.m., Detectives Patrick Kinavey and Timothy Langan, of the Allegheny County Police Department, transported Appellant and Mr. Loving from the McKeesport Police Station to Allegheny County Police Department headquarters, which is located in the Point Breeze neighborhood of Pittsburgh. *Id.* at 256. The trip took 30 minutes and they arrived at headquarters at approximately 4:45 a.m. *Id.* at 257. Upon arrival, the detectives placed Appellant and Mr. Loving in separate interview rooms. *Id.* at 258.

- At approximately 5:00 a.m., the detectives began to interview Mr. Loving. The interview with Mr. Loving lasted approximately one-and-a-half hours and concluded at a little before 6:20 a.m. *Id.* at 259. During this time, Appellant sat in his separate interview room. *Id.*

_____

[4] All of the relevant, underlying events of this case occurred on June 20, 2009. Thus, for purposes of this evidentiary summary, we will not repeat the date of the events.

- At approximately 6:20 a.m., Detectives Kinavey and Langan entered Appellant's interview room and formally introduced themselves to Appellant. *Id.* at 260.

- At approximately 6:28 a.m., Detectives Kinavey and Langan began their interview of Appellant. N.T. Suppression Hearing, 9/27/10, at 46-47. At the outset of the interview, the detectives:

  informed [Appellant] that a woman had been found dead, shot to death, in the City of McKeesport. That an individual had followed [Appellant] from the location where the shooting had occurred, and that . . . the gunshot residue test that [the police] performed on [Appellant's] hands was for any trace amounts of gunshot residue that might show up from somebody that may have fired a weapon.

  *Id.* at 47.

- At approximately 6:28 a.m., the detectives presented a "Waiver of Rights" form to Appellant, "so [that Appellant] could read along as the form was read to him." N.T. Jury Trial, 9/29/10, at 264. Appellant signed the form at 6:28 a.m. *Id.* In doing so, Appellant acknowledged he was aware that: 1) he has a right to remain silent; 2) anything he says "can and will be used against [him] in a [c]ourt of law;" 3) he has "a right to speak to an attorney, and have him or her present before and during questioning;" and, 4) if he "cannot afford an attorney, one will be appointed free of charge before or during any questioning if [he] so desires." N.T. Suppression Hearing, 9/27/10, at 48-49. Appellant also acknowledged that he "underst[ood] each of

these rights that [the detectives] explained" and that, "[h]aving these rights in mind," he still wished to speak to the detectives. *Id.* at 49.

- At no point "before or during [the custodial] interview" did Appellant: "demonstrate to either [Detective Kinavey] or Detective Langan . . . that he was under the influence of alcohol;" "manifest any type of sign that he was impaired;" "tell [Detective Kinavey] that he was unable to understand what was occurring in that interview room;" ask "for the opportunity to speak with a lawyer;" or, "ask that the interview be interrupted or stopped." *Id.* at 51-53; *see also* N.T. Jury Trial, 9/29/10, at 260-262, 266, and 274.

- The detectives interviewed Appellant from approximately 6:30 a.m. until approximately 8:00 a.m. N.T. Jury Trial, 9/30/10, at 304-305. During this time, Appellant provided the detectives with three differing versions of the events. *Id.* at 302-304. In the first version, Appellant stated that he had no involvement in either the robbery or the murder and that he was simply in the wrong place at the wrong time. *See* N.T. Jury Trial, 9/29/10, at 266-267. The detectives "explained to [Appellant] that [the first statement] was simply not true" and Appellant "acknowledged the fact that he was being deceptive." *Id.* at 267-268. In the second version, Appellant stated that he went to the victim's home alone so that he could purchase marijuana and, while he was in the house, "he thought [the victim] was going to kill him . . . [so he] shot her two times." *Id.* at 269.

The detectives informed Appellant that the story was still false. *Id.* at 270. Appellant then admitted to the following:

> [The victim invited Appellant and Mr. Loving into her house; when Appellant and Mr. Loving entered the house, Appellant] produced a .357 Magnum and held it to the victim, and began leading her around the home robbing the residence. . . . [When the victim was in the doorway between the kitchen and the dining room, the victim made] a dashing movement . . . [and Appellant] fired three times at the victim. . . . [H]e missed her with the first shot, hit her with the second shot, and [in Appellant's] words, the third shot put her down.

*Id.* at 271-272.

- At approximately 8:00 a.m., the detectives "concluded the[ir] oral interview with [Appellant]." N.T. Jury Trial, 9/29/10, at 275.

- At approximately 11:26 a.m., the detectives asked Appellant whether he would like to make a "voluntary recorded statement" into a tape recorder. *Id.* at 277-278. Appellant agreed and, in the recorded statement, Appellant again confessed to robbing and murdering the victim. N.T. Jury Trial, 9/30/10, at 289-301.

- At some point that day, a criminal complaint was filed against Appellant and, at 7:30 p.m. that day, Appellant had his preliminary arraignment. *See* Criminal Complaint, 6/20/09, at 1-4; Notice of Preliminary Arraignment, 6/20/09, at 1.

At the conclusion of the suppression hearing, Appellant's counsel argued that Appellant's confession must be suppressed because:

we heard testimony regarding the statement provided. And what I would argue to the [trial c]ourt with regards to why the statement itself should be suppressed . . . is obviously, we have to look at the totality of the circumstances here. That is the test that is to be applied.

[Appellant] has indicated that he was not apprised of his rights. He was never given an opportunity to read the *Miranda* waiver form, and instead he was simply given a form to sign. . . .

What we do know is that [Appellant] is arrested at 1:30 in the morning and it is not until 6:30 in the morning that he signs the *Miranda* waiver form. We have a five hour window of time during which he is being questioned and asked things and five hours between when he is arrested and when he signs the *Miranda* waiver forms. We have an additional five hours between the signing of those *Miranda* forms and the taped statement that police provide. This is a lengthy, long encounter during which he is being questioned and he is being told that they were questioning Calvin Loving. He is being told you are lying to us, we want the true story. Calvin Loving has told us this. He is being fed information and asked questions based upon the fact they are interviewing another individual. The length of time alone, I submit, is enough to suppress the statement.

N.T. Suppression Hearing, 9/27/10, at 115-117.

The trial court denied Appellant's motion to suppress and, after a jury trial, Appellant was found guilty of second-degree murder, robbery, criminal conspiracy, firearms not to be carried without a license, and persons not to possess a firearm.[5] That same day, the trial court sentenced Appellant to serve a term of life in prison without the possibility of parole on the murder

_____

[5] 18 Pa.C.S.A. §§ 2502(b), 3701(a)(1)(i), 903(a)(1), 6106(a)(1), and 6105(a)(1), respectively.

conviction, a consecutive sentence of 80 to 160 months in prison on the robbery conviction, a consecutive sentence of 50 to 100 months in prison for the persons not to possess a firearm conviction, and a concurrent sentence of life in prison without the possibility of parole on the criminal conspiracy conviction. However, on March 9, 2011, the trial court vacated Appellant's sentence in part. Specifically, the trial court vacated Appellant's sentence for criminal conspiracy and resentenced Appellant to serve a concurrent sentence of 20 to 40 years in prison for that conviction. Trial Court Order, 3/9/11, at 1.

Appellant filed a timely notice of appeal from his judgment of sentence. Within Appellant's brief to this Court, Appellant claimed (among other things) that "the trial court erred in denying [Appellant's] pre-trial motion to suppress statements given to the police under coercion and while intoxicated." *See Commonwealth v. Evans*, 43 A.3d 530 (Pa. Super. 2012) (unpublished memorandum) at 4, *appeal denied*, ___ A.3d ___, 69 WAL 2012 (Pa. 2012). We concluded that this particular claim was waived because Appellant's "brief contains no argument in support of [the claim]." *Id.* We found no merit to Appellant's remaining issues and we thus affirmed Appellant's judgment of sentence on January 31, 2012. The Pennsylvania Supreme Court then denied Appellant's petition for allowance of appeal on July 16, 2012. *Commonwealth v. Evans*, 43 A.3d 530 (Pa. Super. 2012) (unpublished memorandum) at 1-10, *appeal denied*, ___ A.3d ___, 69 WAL

2012 (Pa. 2012). Appellant did not file a petition for a writ of *certiorari* with the United States Supreme Court.

On August 16, 2012, Appellant filed a *pro se* PCRA petition. The PCRA court appointed counsel to represent Appellant and, on October 25, 2012, appointed counsel filed an amended PCRA petition. Appellant raised the following claims within his amended PCRA petition: 1) trial counsel was ineffective for failing to properly cross-examine Officer Kondrosky, Officer Marino, and Calvin Loving; and, 2) trial counsel was ineffective for failing to "effectively cross-examine another Commonwealth witness, Daniel McGhen, when [trial counsel] failed to probe [Mr. McGhen's] credibility and [the] reliability of his testimony." Appellant's Amended First PCRA Petition, 10/25/12, at 1-5.

On January 25, 2013, the PCRA court dismissed Appellant's first PCRA petition without holding a hearing. PCRA Court Order, 1/25/13, at 1. Appellant did not file a notice of appeal from the PCRA court's order.

On September 20, 2013, Appellant filed a timely,[6] *pro se*, second PCRA petition. The PCRA court appointed another attorney to represent Appellant

_____

[6] The Pennsylvania Supreme Court denied Appellant's petition for allowance of appeal on July 16, 2012. Appellant's judgment of sentence then became final 91 days after this date (or, on Monday, October 15, 2012), when the time for filing a petition for a writ of *certiorari* with the United States Supreme Court expired. U.S.Sup.Ct.R. 13(1); 42 Pa.C.S.A. § 9545(b)(3) ("[f]or purposes of [the PCRA], a judgment becomes final at the conclusion of direct review, including discretionary review in the Supreme Court of the United States and the Supreme Court of Pennsylvania, or at the expiration of
*(Footnote Continued Next Page)*

and, on February 21, 2014, appointed counsel filed an amended second PCRA petition. Appellant pleaded the following claims in his amended second PCRA petition:

> [1)] PCRA counsel was ineffective for failing to raise trial counsel's ineffectiveness for failing to file a motion to suppress [Appellant's] confession as a violation of the presentment requirements [under] Pennsylvania Rule of Criminal Procedure 519[;]
>
> . . .
>
> [2)] PCRA counsel was ineffective for her failure to claim that trial counsel was ineffective for failing to object to the presence of Calvin Loving's counsel with him on the stand[; and,]
>
> . . .
>
> [3)] PCRA counsel was ineffective for her failure to claim that appellate counsel was ineffective for his failure to properly brief and preserve [Appellant's] **Miranda** suppression issue for appeal[.]

Appellant's Amended Second PCRA Petition, 2/21/14, at ¶¶ 61-67.

The PCRA court dismissed Appellant's second PCRA petition in an order dated December 8, 2014 and entered April 13, 2015. PCRA Court Order, 4/13/15, at 1. Appellant filed a timely notice of appeal and Appellant now raises the following claims to this Court:

_(Footnote Continued)_ ───────────────────

time for seeking the review"). Appellant filed his second PCRA petition on September 20, 2013. The petition is thus timely, as it was filed "within one year of the date [Appellant's] judgment [of sentence became] final." 42 Pa.C.S.A. § 9545(b)(1).

[1.] Whether the [PCRA] Court erred in finding that the issues raised in [Appellant's] second PCRA petition were waived when the second petition was timely filed and the ineffectiveness of PCRA counsel was never previously litigated?

[2.] Whether the [PCRA] Court erred in finding that PCRA counsel was not ineffective for failing to raise trial counsel's ineffectiveness for failing to file a suppression motion under Pennsylvania Rule of Criminal Procedure 519 even though [Appellant] was held in police custody for ten hours prior to providing his recorded statement?

[3.] Whether the [PCRA] Court erred when it found that PCRA counsel was not ineffective for failing to raise and argue that appellate counsel was ineffective for failing to plead and preserve the *Miranda* suppression issue raised by trial counsel where [Appellant] was in police custody for five hours prior to being given his *Miranda* rights, and the record shows that the trial court based its denial of the suppression motion improperly on [Appellant's] credibility related to collateral matters?

[4.] Whether the [PCRA] Court erred when it found that PCRA counsel was not ineffective for failing to argue that trial counsel was ineffective for failing to timely object to the presence of a testifying co[-]defendant's attorney on the stand with him during testimony even though the record was not fully developed as to the nature or scope of the assistance the attorney provided to the client?

Appellant's Brief at 4-5 (some internal capitalization omitted).[7]

As we have stated:

[t]his Court's standard of review regarding an order dismissing a petition under the PCRA is whether the determination of the PCRA court is supported by evidence of record and is free of legal error. In evaluating a PCRA court's decision, our scope of review is limited to the

_____

[7] For ease of discussion, we have re-ordered Appellant's claims on appeal.

- 13 -

findings of the PCRA court and the evidence of record, viewed in the light most favorable to the prevailing party at the trial level. We may affirm a PCRA court's decision on any grounds if it is supported by the record.

*Commonwealth v. Rivera*, 10 A.3d 1276, 1279 (Pa. Super. 2010) (internal citations omitted).

To be eligible for relief under the PCRA, the petitioner must plead and prove by a preponderance of the evidence that his conviction or sentence resulted from "one or more" of the seven, specifically enumerated circumstances listed in 42 Pa.C.S.A. § 9543(a)(2). One of these statutorily enumerated circumstances is the "[i]neffectiveness of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." 42 Pa.C.S.A. § 9543(a)(2)(ii).

Counsel is, however, presumed to be effective and "the burden of demonstrating ineffectiveness rests on [A]ppellant." *Commonwealth v. Rivera*, 10 A.3d 1276, 1279 (Pa. Super. 2010). To satisfy this burden, Appellant must plead and prove by a preponderance of the evidence that:

> (1) his underlying claim is of arguable merit; (2) the particular course of conduct pursued by counsel did not have some reasonable basis designed to effectuate his interests; and, (3) but for counsel's ineffectiveness, there is a reasonable probability that the outcome of the challenged proceedings would have been different.

*Commonwealth v. Fulton*, 830 A.2d 567, 572 (Pa. 2003). "A failure to satisfy any prong of the test for ineffectiveness will require rejection of the claim." *Id.*

- 14 -

Further, in reviewing Appellant's claims:

> we must be mindful that this is his second collateral attack on his convictions and judgment of sentence. Thus, [Appellant's] request for relief will not be entertained unless a strong *prima facie* showing is offered to demonstrate that a miscarriage of justice may have occurred. An appellant makes such a *prima facie* showing only if he demonstrates that either the proceedings which resulted in his conviction were so unfair that a miscarriage of justice occurred which no civilized society could tolerate, or that he was innocent of the crimes for which he was charged.

*Commonwealth v. Morales*, 701 A.2d 516, 520-521 (Pa. 1997) (internal citations and quotations omitted); *see also Commonwealth v. Marshall*, 947 A.2d 714, 719 (Pa. 2008) (same).

Appellant does not claim that he was actually innocent of the crimes for which he was convicted. Therefore, before the courts may entertain Appellant's second PCRA petition, Appellant must demonstrate that "the proceedings which resulted in his conviction were so unfair that a miscarriage of justice occurred which no civilized society could tolerate." *Morales*, 701 A.2d at 520-521.

All of Appellant's substantive claims assert that the PCRA court erred when it dismissed one of his properly-layered ineffective assistance of counsel claims without holding a hearing. Since all of Appellant's claims assert that his PCRA counsel was ineffective for failing to raise certain issues in his initial PCRA petition – and since this is the first time that Appellant had the opportunity to argue that his initial PCRA counsel was ineffective – none of Appellant's current ineffective assistance of counsel claims are waived

under the PCRA. *See* 42 Pa.C.S.A. § 9544(b) ("an issue is waived [under the PCRA] if the petitioner could have raised it but failed to do so before trial, at trial, . . . on appeal or in a prior state post[-]conviction proceeding"). Therefore, to the extent the PCRA court found that Appellant's properly-layered ineffective assistance of counsel claims were waived under the PCRA, we agree with Appellant that the conclusion was made in error. *See* PCRA Court Opinion, 4/8/15, at 2. Nevertheless, we conclude that the PCRA court did not err when it dismissed Appellant's second PCRA petition without holding a hearing, as all of Appellant's claims are meritless. *Commonwealth v. Cassidy*, 462 A.2d 270, 272 (Pa. Super. 1983) (holding that the Superior Court "will affirm the trial court's decision if the result is correct on any ground, without regard to the grounds on which the trial court relied").

Appellant contends that the PCRA court erred in dismissing his layered claim that his PCRA counsel was ineffective for not raising the claim that his trial counsel was ineffective when trial counsel failed to seek the suppression of Appellant's post-arrest, pre-arraignment, custodial confession. Appellant's Brief at 19. Specifically, Appellant claims that his trial counsel should have filed a suppression motion and claimed that Appellant's confession was involuntary, as it was given long after Appellant's arrest and without Appellant having been arraigned. *Id.* at 22-23. This claim fails because Appellant's trial counsel, **in fact**, filed a suppression motion and claimed that Appellant's post-arrest custodial confession was involuntary and

must be suppressed because (among other things) it was the product of Appellant's lengthy post-arrest detention and interrogation. Appellant's Motion to Suppress, 9/15/10, at 5-6; N.T. Suppression Hearing, 9/27/10, at 116. Therefore, since Appellant's trial counsel raised the issue below, Appellant's initial PCRA counsel could not have been ineffective for failing to claim otherwise. Appellant's layered ineffective assistance of counsel claim thus fails. We will explain.

In relevant part, Pennsylvania Rule of Criminal Procedure 519 provides:

> . . . when a defendant has been arrested without a warrant in a court case, a complaint shall be filed against the defendant and the defendant shall be afforded a preliminary arraignment by the proper issuing authority without unnecessary delay.

Pa.R.Crim.P. 519(A)(1).

As the Pennsylvania Supreme Court has explained:

> the right to prompt arraignment . . . is not constitutionally mandated, but it ensures a defendant is afforded the constitutional rights protected by [Pennsylvania Rule of Criminal Procedure] 540, which requires the issuing authority to: read the complaint to a defendant to inform him of the nature of the charges against him, Pa. Const. art. I, § 9; inform him of his right to counsel, U.S. Const. Amends. VI, XIV, Pa. Const. art. I, § 9; and inform him of his right to reasonable bail. Pa. Const. art. 1, § 14. **See** Pa.R.Crim.P. 540(E)(1)-(3), (G). Prompt arraignment also protects a defendant's right to be free from unreasonable seizure of his person[,] U.S. Const. Amends. IV, XIV, Pa. Const. art. I, § 8 . . . [and] guard[s] against the coercive influence of custodial interrogation.

*Commonwealth v. Perez*, 845 A.2d 779, 782-783 (Pa. 2004) (some internal quotations and citations omitted).

In *Perez*, the Pennsylvania Supreme Court summarized the evolution of its approach to enforcing the prompt arraignment requirement. The *Perez* Court explained:

> [Prior to 1977,] to enforce the prompt arraignment requirement, [the Pennsylvania Supreme Court] held all evidence obtained during unnecessary delay between arrest and arraignment was inadmissible, unless the evidence bore no relationship to the delay. . . .
>
> [In *Commonwealth v. Davenport*, 370 A.2d 301 (Pa. 1977), the Supreme] Court adopted a rule that made the admissibility of statements obtained between arrest and arraignment dependent on the length of time between these events:  "[i]f the accused [was] not arraigned within six hours of arrest, any statement obtained after arrest but before arraignment [was not] admissible at trial."  *Id.* [at 306].
>
> In [*Commonwealth v. Duncan*, 525 A.2d 1177 (Pa. 1987) (plurality), a plurality of the Supreme Court modified the rule,] in response to a decade of mechanical enforcement of the six-hour period. . . .  [The *Duncan* plurality declared that,] in determining whether to suppress an incriminating statement, "the focus should be upon when the statement was obtained, *i.e.*, within or beyond the six-hour period." *Id.* [at 1182 (internal emphasis omitted)].  Accordingly, the rule was modified to allow the admission of statements made within six hours of arrest, regardless of when arraignment occurred, as such statements were not the product of delay.

*Perez*, 845 A.2d at 783.

In its 2004 *Perez* opinion, the Pennsylvania Supreme Court eliminated the strict "six-hour rule" and held that "the time that elapses between arrest

and arraignment, by itself, is not grounds for suppression." *Id.* at 787. Rather, the Supreme Court held, the length of time an accused has spent in custody prior to confessing was simply "one factor that must be considered in determining whether, in the totality of circumstances," the accused's statement was voluntary. *Id.* As the *Perez* Court held:

> in determining the admissibility of all statements, regardless of the time of their making, courts must consider the totality of the circumstances surrounding the confession. The factors noted [by the Supreme Court of Michigan] in [*People v. Cipriano*, 429 N.W.2d 781 (Mich. 1997),] are relevant, as are those which have traditionally been recognized in determining the voluntariness of a confession[. The factors noted in *Cipriano* were]:
>
> unnecessary delay in arraignment[;] . . . the accused's age; his level of education and intelligence; the extent of his previous experience with police; the repeated and prolonged nature of the questioning; the length of detention prior to the confession; whether he was advised of his constitutional rights; whether he was injured, ill, drugged, or intoxicated when he confessed; whether he was deprived of food, sleep, or medical attention; and whether he was physically abused or threatened with abuse.
>
> . . . Some of the [other] factors to be considered include: the duration and means of interrogation; the defendant's physical and psychological state; the conditions attendant to the detention; the attitude exhibited by the police during the interrogation; and any other factors which may serve to drain one's powers of resistance to suggestion and coercion.

*Perez*, 845 A.2d at 785 and 787 (some internal citations and quotations omitted), *quoting in part Cipriano*, 429 N.W.2d at 790.

In the current appeal, Appellant claims that his PCRA counsel was ineffective for "failing to raise trial counsel's ineffectiveness for failing to file

a suppression motion under Pennsylvania Rule of Criminal Procedure 519 even though [Appellant] was held in police custody for ten hours prior to providing his recorded statement." Appellant's Brief at 4. However, as outlined above, Appellant's trial counsel, in fact, claimed that the trial court must suppress Appellant's custodial confession, as it was the product of Appellant's lengthy post-arrest detention and interrogation. Indeed, within Appellant's written suppression motion, Appellant claimed that his custodial confession was involuntary, as it was the product of his "intoxicated state, the lack of **Miranda**[8] [w]arnings, the refusal to grant him his request for counsel, **and the [five] hour delay between arrest and confession**." Appellant's Motion to Suppress, 9/15/10, at 5-6 (emphasis added). Further, during both the suppression hearing and trial, the Commonwealth and Appellant created a comprehensive record that detailed: the length and circumstances of Appellant's post-arrest detention; the reasons for the detention; the length of Appellant's interrogation; the means of Appellant's interrogation; Appellant's physical and psychological state during the detention and interrogation; and, the attitudes exhibited by the detectives during Appellant's detention and interrogation. **See supra** at \*\*4-9. Finally, during the suppression hearing, Appellant's trial counsel **expressly**

_____

[8] **Miranda v. Arizona**, 384 U.S. 436 (1966).

**claimed** that the trial court must suppress the confession because it was the product of Appellant's lengthy post-arrest detention and interrogation. As Appellant's trial counsel argued at the suppression hearing:

> And what I would argue . . . with regards to why the statement itself should be suppressed . . . is obviously, we have to look at the totality of the circumstances here.
>
> . . .
>
> What we do know is that [Appellant] is arrested at 1:30 in the morning and it is not until 6:30 in the morning that he signs the *Miranda* waiver form. **We have a five hour window of time during which he is being questioned and asked things and five hours between when he is arrested and when he signs the *Miranda* waiver forms. We have an additional five hours between the signing of those *Miranda* forms and the taped statement that police provide. This is a lengthy, long encounter during which he is being questioned** and he is being told that they were questioning Calvin Loving. He is being told you are lying to us, we want the true story. Calvin Loving has told us this. He is being fed information and asked questions based upon the fact they are interviewing another individual. **The length of time alone, I submit, is enough to suppress the statement**.

N.T. Suppression Hearing, 9/27/10, at 115-117 (emphasis added).

Therefore, although Appellant's trial counsel did not phrase Appellant's suppression claim in terms of Pennsylvania Rule of Criminal Procedure 519, the substance of the claim was the same. Specifically, Appellant's trial counsel claimed that Appellant's lengthy post-arrest detention and interrogation required the suppression of Appellant's custodial confession. Under ***Perez***, this claim is substantively identical to the claim Appellant currently raises: that trial counsel was ineffective "for failing to file a

suppression motion under Pennsylvania Rule of Criminal Procedure 519 even though [Appellant] was held in police custody for ten hours prior to providing his recorded statement." Appellant's Brief at 4. Thus, since Appellant's trial counsel raised the underlying substantive claim that is at issue, Appellant's PCRA counsel could not have been ineffective for "failing to raise trial counsel's ineffectiveness for failing to file a suppression motion under Pennsylvania Rule of Criminal Procedure 519 even though [Appellant] was held in police custody for ten hours prior to providing his recorded statement." Appellant's Brief at 4. Appellant's claim to the contrary fails.

Next, Appellant claims that his PCRA counsel was ineffective "for failing to raise and argue [the claim] that appellate counsel was ineffective for failing to plead and preserve the *Miranda* suppression issue raised by trial counsel." Appellant's Brief at 4. According to Appellant, the totality of the circumstances in this case demonstrates that Appellant's post-arrest confession was coerced and that the trial court erred when it denied his pre-trial motion to suppress. Appellant thus claims that his appellate counsel was ineffective for failing to properly raise, on direct appeal, the claim that the suppression court erred in denying his suppression motion – and that his PCRA counsel was ineffective for failing to raise the claim in his initial PCRA petition. Appellant's Brief at 33-37. This ineffective assistance of counsel claim fails because the underlying substantive claim has no merit.

"Once a motion to suppress evidence has been filed, it is the Commonwealth's burden to prove, by a preponderance of the evidence, that

the challenged evidence was not obtained in violation of the defendant's rights." ***Commonwealth v. Wallace***, 42 A.3d 1040, 1047-1048 (Pa. Super. 2012) (*en banc*); ***see also*** Pa.R.Crim.P. 581(H).  With respect to an appeal from the denial of a motion to suppress, our Supreme Court has declared:

> Our standard of review in addressing a challenge to a trial court's denial of a suppression motion is whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct.  When reviewing the ruling of a suppression court, we must consider only the evidence of the prosecution and so much of the evidence of the defense as remains uncontradicted when read in the context of the record. . . .  Where the record supports the findings of the suppression court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error.

***Commonwealth v. Eichinger***, 915 A.2d 1122, 1134 (internal citations omitted).  "It is within the suppression court's sole province as factfinder to pass on the credibility of witnesses and the weight to be given their testimony." ***Commonwealth v. Gallagher***, 896 A.2d 583, 585 (Pa. Super. 2006).

The trial court explained the reasons it denied Appellant's pre-trial motion to suppress:

> Appellant alleges that his statements were not knowing, intelligent[,] and voluntary because he was in a debilitated state caused by coercion and intoxication.  Voluntariness is determined from the totality of the circumstances surrounding the statement. ***Schneckloth v. Bustamonte***, 412 U.S. 218 (1973); ***Commonwealth v. Jones***, 683 A.2d 1181 (Pa. 1996).  The Commonwealth has the burden of proving by a preponderance of the evidence that

- 23 -

[Appellant's] statement was voluntary. When assessing voluntariness pursuant to the totality of the circumstances, a court should look at the following factors: the duration and means of the interrogation; the physical and psychological state of the accused; the conditions attendant to the detention; the attitude of the interrogator; and any and all other factors that could drain a person's ability to withstand suggestion and coercion. ***Commonwealth v. Edmiston***, 634 A.2d 1078 (Pa. 1993).

Several officers testified that they saw no evidence of intoxication on the part of Appellant. Officers observed no slurred speech or difficulty in understanding or answering questions. Appellant had been read his ***Miranda*** rights and indicated that he understood them. In fact, several times Appellant indicated he understood his rights. Appellant remained awake and coherent throughout the interview. Appellant [was not] subjected to an unduly lengthy or difficult interrogation. Given the totality of the circumstances, [the trial court] did not err in denying the motion to suppress.

Trial Court Opinion, 3/9/11, at 7-8 (some internal citations omitted).

The record supports the trial court's factual findings. Certainly, after viewing "only the evidence of the prosecution and so much of the evidence of the defense as remains uncontradicted," the record demonstrates that at no point "before or during [the custodial] interview" did Appellant: "demonstrate to either [Detective Kinavey] or Detective Langan . . . that he was under the influence of alcohol;" "manifest any type of sign that he was impaired;" "tell [Detective Kinavey] that he was unable to understand what was occurring in that interview room;" ask "for the opportunity to speak with a lawyer;" or, "ask that the interview be interrupted or stopped." N.T. Suppression Hearing, 9/27/10, at 51-53; ***see also*** N.T. Jury Trial, 9/29/10, at 260-262, 266, and 274. Further, the record supports the trial court's

factual determination that Appellant was not "subjected to an unduly lengthy or difficult interrogation." Trial Court Opinion, 3/9/11, at 8. Indeed, during Appellant's recorded statement – which constituted the final, relevant interaction between Appellant and the detectives – Detective Kinavey asked Appellant: "how do you feel that we have treated you this morning? Do you feel that you've been treated good? Have you [] been given water, drinks or whatever you need?" N.T. Jury Trial, 9/30/10, at 300. Appellant responded: "Everything is cool man. You treat me good, you know what I mean, even though you shouldn't, because I'm a dumb ass." *Id.*

Hence, "the factual findings [of the suppression court were] supported by the record and [] the legal conclusions [the suppression court drew] from those facts [were] correct." *Eichinger*, 915 A.2d at 1134. As such, even if Appellant had properly raised, on direct appeal, his claim that the suppression court erred when it denied his suppression motion, this Court would have denied the claim for relief; and, since counsel cannot be held ineffective for failing to pursue a meritless claim, Appellant's current ineffective assistance of counsel claim fails. *Commonwealth v. Washington*, 927 A.2d 586, 603 (Pa. 2007) ("[c]ounsel will not be deemed ineffective for failing to raise a meritless claim").[9]

_____

[9] With respect to this claim, Appellant also alleges that "the trial court's decision to deny [Appellant's] suppression motion was improperly based upon her assessment of [Appellant's] credibility relative to collateral matters." Appellant's Brief at 34. This argument is devoid of merit, given
*(Footnote Continued Next Page)*

Finally, Appellant raises a layered claim that his trial counsel was ineffective "for failing to timely object to the presence of a testifying co[-]defendant's attorney on the stand with him during testimony." Appellant's Brief at 4. This claim fails.

During Appellant's case-in-chief, Appellant called his co-conspirator, Calvin Loving, as a witness. At the time, Mr. Loving was represented by Thomas Farrell, Esquire (hereinafter "Attorney Farrell"). Prior to Mr. Loving's testimony, Attorney Farrell declared to the trial court: "my client has [a] Fifth Amendment right as to each and every question." N.T. Jury Trial, 9/30/10, at 326. In view of this, Attorney Farrell requested that the trial court allow him to "sit next to" Mr. Loving during questioning and be available for Mr. Loving "to consult with [] on each and every question." *Id.* Appellant's trial counsel did not object to this proposal and the trial court initially allowed Attorney Farrell to sit next to Mr. Loving during examination and to be available "to consult with" Mr. Loving. *Id.* at 326 and 420-424.

During Mr. Loving's direct testimony, Mr. Loving testified that he signed a particular affidavit and, within this affidavit, he stated:

> I did it and [Appellant] didn't have nothing to do with it. I went to the crib/house by myself and went there [] to make a sale to her and she tried to give me the runaround and she said that her son had the money and he wasn't there.

(Footnote Continued) ─────────────────

that the trial court judge thoroughly explained the reasons she denied Appellant's suppression motion – and the trial court's reasons were proper, collectively sufficient, and supported by the record evidence.

- 26 -

> So, she went upstairs and brought a gun out of the room and tried to rob me. So, I took my gun out to protect myself and I hit her with the gun, so she could give up her gun from her hand.
>
> Then we went downstairs and she ran, so I thought she was going to get something, so I had shot three times and ran out of the house with the bag and two guns.

N.T. Jury Trial, 9/30/10, at 350-351.

Mr. Loving's affidavit was read to the jury and the written document admitted into evidence. *Id.*

However, during the Commonwealth's cross-examination of Mr. Loving, Mr. Loving testified that: while he was an inmate in the Allegheny County Jail, "three males" gave him the affidavit; one or all of those three males prepared the document; and, "before [he was] given this document, [he] was assaulted" by the three males. *Id.* at 355. As Mr. Loving testified:

> [t]hey kicked me, punched me, and brought blades out. I thought I was going to die. They shaved my eyebrows. I thought I was going to die there, so they told me to sign the paper telling them that you did it and that's what I did.

*Id.*

As Mr. Loving testified, every statement in the affidavit was false. *Id.* at 357-359.

Mr. Loving also testified that the robbery and murder in this case transpired in the following manner: Mr. Loving and Appellant went to the victim's home, intending to rob the victim's son; while speaking with the victim on her porch, Appellant pointed his gun at the victim; with the victim at gunpoint, Mr. Loving, Appellant, and the victim entered the house; while

- 27 -

Appellant held the victim at gunpoint, Mr. Loving moved through the house, placing items in a hamper; after ordering the victim to lie face down, Appellant went into the kitchen and began searching in the kitchen drawers; "at some point, . . . [the victim] jump[ed] up and start[ed] to run;" Mr. Loving heard "two or three shots coming from the kitchen area;" and, Appellant and the victim were the only people who were in the kitchen area. *Id.* at 364-380.

The record also reveals two instances where Attorney Farrell consulted with Mr. Loving during Mr. Loving's testimony. The first instance occurred during the Commonwealth's cross-examination of Mr. Loving; it transpired in the following manner:

> Q: Did you have toilet talk with other people that were incarcerated who you knew to be associated with [Appellant].
>
> A: Yes, sir.
>
> Q: And the extent of those conversations or the nature of those conversations, did they refer to your making an exculpatory statement on behalf of [Appellant]?
>
> A: No, sir.
>
> Q: Can you tell me what an exculpatory statement is, please?
>
> [Appellant's Counsel]: That question has been asked and answered.
>
> [Trial Court]: And [Attorney] Farrell consulted with his client to ask his client if he knew what the word exculpatory meant, to which he responded, no. And [Attorney] Farrell

directed him to ask the Commonwealth to explain that word
or use a different word. I will allow him to answer.

Q: [] the toilet talk with the other persons, tell the jury
about what was said in this manner between yourself and
the other people?

A: It was a friend that I knew, he said, what's up? That's all
he was saying. What's up? How are you doing. And I'm in
there saying, what's up? How you doing? And the next
minute I . . . got jumped.

*Id.* at 413-414.

The second instance where Attorney Farrell consulted with Mr. Loving

occurred during the Commonwealth's re-cross examination of Mr. Loving.

The entirety of this occurrence – including Appellant's objection, Attorney

Farrell's sworn answers to the trial court, and the trial court's ruling –

occurred as follows:

Q: . . . do you . . . have any expectation from the District
Attorney of Allegheny County, for your testifying today?

(Whereupon, the witness confers with his attorney.)

[Appellant's Counsel]: May we approach?

[Trial Court]: You may.

(The following discussion was held at sidebar.)

[Appellant's Counsel]: Your Honor, I object to the manner in
which this is occurring with [Attorney] Farrell giving him
input between every question. There is no other witness
that you can put on the stand that that happens with. He
has asserted he is waiving his Fifth Amendment privilege.
Once he waives that, he is like every other witness. I
cannot put my client on the stand and say, don't answer
that.

[Trial Court]: I'll instruct [Attorney Farrell] that he can't talk to his client about anything except the question regarding his Fifth Amendment rights. Up to this point I have observed only two times [Attorney] Farrell has done that. The first time, because he was afraid or aware that his client didn't understand the word and simply asked him that question to which the client responded as [Attorney] Farrell thought he would, that he didn't understand the word.

At this time the client looked to him and [Attorney] Farrell simply responded to the look, because of his obligation to represent his client with regard to the Fifth Amendment right. Once it became clear to him he wasn't being asked about asserting the Fifth Amendment right, he should have just instructed his client to answer the question.

I'll call him up here and ask him if that is in fact what he did.

[Appellant's Counsel]: My concern was the question whether or not Calvin Loving is going to get any consideration. For him not to answer that, [Attorney] Farrell answered in his ear.

[Trial Court]: You can ask him on that point. But I'll call [Attorney] Farrell up right now and have him tell us what it is he told him. [Attorney] Farrell is obviously a very experienced defense trial lawyer. He would be under an obligation to be truthful to us. I'll ask him to put on the record what it is he said to his client and I'll also advise him that other than questions from his client regarding his Fifth Amendment right he should not tell his client what he is to say other than be truthful.

[Attorney] Farrell, if you could approach at sidebar.

(Whereupon, [Attorney] Farrell comes to sidebar.)

[Trial Court]: [Appellant's counsel] has raised an objection. In this instance your client looked to you. You probably responded, because you do have an obligation to advise him on any questions he might have regarding his Fifth Amendment right or other rights that may apply.

- 30 -

[Attorney Farrell]:  That is correct.

[Trial Court]: Beyond that, however, she would not want you coaching him as to what to say in that regard.  I don't know what you said to him.  I couldn't hear that, but I would assume that you would know what limits there would be and you would advise him to testify truthfully.

[Attorney Farrell]: I've always advised my client to testify truthfully.  My client, as you have seen already, is not the smartest guy in the world.  He doesn't even understand what exculpatory means.  So there are things when he looks to me, he looks to me for advice.  And it is too bad that [Appellant's] counsel has a problem with that, but she probably shouldn't have called my client in the first place.  I'm not coaching him what to say.  However, I'm advising him, and he has a right to counsel, and that's what I'm here for.  It is kind of ironic that she would call my client and then complain about this.  If [the Commonwealth] had complained, I could understand it.  But it is kind of funny that she actually calls my client and now she is complaining about it.  I will not coach my client.

[Trial Court]: Thank you.

*Id.* at 420-424.

Other than these two rather innocuous instances,[10] the record does not reveal any other time where Attorney Farrell consulted with Mr. Loving during Mr. Loving's testimony.

_____

[10] Later during the Commonwealth's re-cross examination of Mr. Loving, Mr. Loving testified:

Q: Are you aware that you have a trial scheduled for December of 2010, the jury trial scheduled, correct?

A: Yes, sir.

*(Footnote Continued Next Page)*

- 31 -

As stated above, within Appellant's second PCRA petition, Appellant raised a layered ineffective assistance of counsel claim, contending that trial counsel was ineffective for failing "to object to the presence of Calvin Loving's counsel with him on the stand."  Appellant's Amended Second PCRA Petition, 2/21/14, at ¶ 65.  Within this petition, Appellant noted the two, above-summarized instances where Attorney Farrell consulted with Mr. Loving during Mr. Loving's testimony.  *See id.* at ¶ 65(c).  Appellant did not plead that there were any other instances where Attorney Farrell consulted

*(Footnote Continued)* ────────────────

> Q: And are you aware that you are facing the charge of [c]riminal [h]omicide?
>
> A: Yes, sir.
>
> Q: And also a charge of [r]obbery?
>
> A: Yes, sir.
>
> . . .
>
> Q: At any time have you expected the Commonwealth or myself as an Assistant District Attorney to enter into a plea agreement in your prosecution?
>
> A: No, sir.
>
> Q: [Have] any promises been made to you at any time that I would or the Commonwealth or the District Attorney's [O]ffice of Allegheny County would entertain a plea agreement offer?
>
> A: No, sir.

N.T. Jury Trial, 9/30/10, at 426.

with Mr. Loving. *See id.* at ¶ 65(a)-(l). Nevertheless, according to Appellant, in failing "to object to the presence of Calvin Loving's counsel with him on the stand," Appellant's trial counsel allowed "Mr. Loving's responses to the questions that he was asked [to] not [be] based on his own independent knowledge and recollection of events, but rather upon the assistance that was provided by [Attorney] Farrell." *Id.* at ¶ 65.

As noted, the PCRA court dismissed this claim without holding a hearing. Now on appeal, Appellant claims that he was entitled to an evidentiary hearing on his claim because "[i]t is impossible to know the scope and nature of the assistance [Attorney] Farrell provided and to what extent, if any, his assistance had upon the testimony of Mr. Loving." Appellant's Brief at 32.

Appellant's argument is not persuasive. To be sure, during trial, the trial court questioned Attorney Farrell on "the scope and nature of the assistance [Attorney] Farrell provided" to Mr. Loving and the trial court made a finding that Attorney Farrell **did not** improperly suggest answers to Mr. Loving. N.T. Jury Trial, 9/30/10, at 420-424. Certainly, during sidebar, the trial court informed counsel that there were only two instances where she observed Attorney Farrell consult with Mr. Loving: once "to ask [Mr. Loving] if he knew what the word exculpatory meant, to which [Mr. Loving] responded, no[; a]nd [Attorney] Farrell directed [Mr. Loving] to ask the Commonwealth to explain that word or use a different word;" and, once where the Commonwealth asked Mr. Loving whether he had "any

- 33 -

expectation from the District Attorney of Allegheny County, for [his] testifying today." **Id.** at 413-414 and 420-424. With respect to the latter instance, Attorney Farrell expressly told the trial court that his consultation with his client was "not [to] coach[] him what to say"[11] – and the trial court believed Attorney Farrell. **Id.** at 420-424.

Therefore, Appellant is incorrect to claim that, without an evidentiary hearing, "[i]t is impossible to know the scope and nature of the assistance [Attorney] Farrell provided and to what extent, if any, his assistance had upon the testimony of Mr. Loving." **See** Appellant's Amended Second PCRA Petition, 2/21/14, at ¶ 65; Appellant's Brief at 32. Rather, in this case, the able trial court judge held a sidebar, where she questioned Attorney Farrell, and then determined that there were only two instances of consultation between Attorney Farrell and Mr. Loving. N.T. Jury Trial, 9/30/10, at 420-424. Moreover, after questioning Attorney Farrell, it was revealed that "the scope and nature" of the consultations were innocuous – and that it did not taint or alter Mr. Loving's "independent knowledge and recollection of events." **Id.**; **see also** Appellant's Amended Second PCRA Petition, 2/21/14, at ¶ 65.

_____

[11] As an officer of the court, Attorney Farrell had an ethical obligation to "not knowingly . . . make a false statement of material fact or law to a tribunal." Pa.R.P.C. 3.3(1).

Hence, even if the trial court erred when it allowed Attorney Farrell to sit next to and consult with Mr. Loving, the error did not cause Appellant prejudice. **Fulton**, 830 A.2d at 572 (to establish prejudice under the PCRA, Appellant must plead and prove that, "but for counsel's ineffectiveness, there is a reasonable probability that the outcome of the challenged proceedings would have been different"). Moreover, within Appellant's PCRA petition, Appellant did not plead that any other, unrecorded instance of consultation occurred between Attorney Farrell and Mr. Loving during Mr. Loving's testimony. Therefore, Appellant was not entitled to an evidentiary hearing on his ineffective assistance of counsel claim. Pa.R.Crim.P. 907(1) (declaring that the PCRA court may dismiss a PCRA petition without holding a hearing if "the judge is satisfied from this review that there are no genuine issues concerning any material fact and that the defendant is not entitled to post-conviction collateral relief, and no purpose would be served by any further proceedings"); **see also Commonwealth v. Wallace**, 724 A.2d 916, 921 n.5 (Pa. 1999) (holding that a failure to raise a claim "in the PCRA petitions presented to the PCRA court" waives the claim for purposes of appellate review); **Commonwealth v. Rainey**, 928 A.2d 215, 226 (Pa. 2007) (same); **see also** 42 Pa.C.S.A. § 9543(a) ("[t]o be eligible for relief under [the PCRA], the petitioner must plead and prove by a preponderance of the evidence all of the following. . ."); Pa.R.Crim.P. 902 ("Content of Petition for Post-Conviction Collateral Relief").

- 35 -

The PCRA court thus did not err when it dismissed Appellant's second PCRA petition without holding a hearing.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/22/2016